Case Numbers 17-6151 and 17-6183, EMW Women's Surgical Center, PSC, et al. v. Andrew Beshear, et al. Oral argument not to exceed 15 minutes to be shared by the defendants, 15 minutes for the plaintiffs. Chad Meredith for the appellant, you may proceed. May it please the Court. Good morning, Your Honors. My name is Chad Meredith, and I represent Secretary Adam Meyer in the Kentucky Cabinet for Health and Family Services in this case. Your Honors, I'm going to be arguing this morning on behalf of the Commonwealth with respect to the merits of House Bill 2, Kentucky's Ultrasound Abortion Informed Consent Statute, and I'll be speaking for nine minutes on that issue, Your Honors. Following me, Mr. Travis Mayo, my colleague from the Attorney General's Office, would like to address the Court, and he's going to speak for three minutes on the issue of whether the Attorney General's Office and the Board of Medical Licensure ought to be parties in this case. And Your Honors, finally, I'd like to reserve three minutes of the appellant's time for my rebuttal. Your Honors, this case is not about the right to an abortion, nor is it about the undue burden standard. This is a First Amendment free speech case, Your Honors. And in light of the fact that this is a First Amendment free speech case, the District Court did something truly remarkable. It enjoined Kentucky's House Bill 2, which is a duly enacted state statute that does nothing more than require physicians, prior to performing a medical procedure, to provide patients with truthful, non-misleading disclosures that are relevant to their decision to undergo that procedure. Well, that's all that it provided. Didn't the existing statute prior to HB 2 provide that information? Well, that's a good question, Your Honor. It's true, Kentucky had an informed consent statute prior to House Bill 2, but, Your Honor, there's nothing in the First Amendment that prohibits states from addressing issues incrementally. In 2017, the Kentucky General Assembly decided that it needed to go further than the existing informed consent statute. It decided that it would be more prudent for women to be provided the information required by House Bill 2. Your Honor, when you look at the case law that applies in these cases, the Fifth Circuit and the Eighth Circuit also allowed states to act incrementally. There's nothing that says that a state has to act all at once, at one time, for all time. States can move incrementally. But even under the first statute, there was nothing that prohibited women who wanted that additional information from getting that through their physicians, was there? That's correct, Your Honor. That's exactly right. But the problem that the General Assembly perceived, Your Honor, and the problem also that we see in the record. We have affidavits in the record of this effect. The problem is that there are a number of patients who don't know the information that's provided by House Bill 2. And the General Assembly doesn't know what patients don't know, if that makes sense. For instance, there might be instances where a patient is offered the information. Maybe a doctor says, well, I'll show you the ultrasound if you want. And maybe the patient has a mistaken understanding that the patient already knows everything they need to know. And, for instance, the affidavits in the record, Your Honor, tell us that. These patients who submitted affidavits said, well, we didn't understand the nature of our fetus prior to our abortion. We were under the impression that it was just an inanimate clump of cells and tissue. We didn't know that it was already assuming the human form, that it looked like a human. And had we known that, had we actually seen that, we might have made a different decision. And we don't think we would have suffered the horrible mental distress that we later suffered when we came to realize what we didn't know at the time. And, Your Honor, the United States Supreme Court spoke to this. Before you go to the United States Supreme Court, were these affidavits to which you refer post-2000 affidavits, were these affidavits that occurred after Kentucky adopted its initial informed consent statute? Your Honor, the affidavits don't set forth exactly when those women were treated. So we don't know the exact time frame. But the key point is that they portray that not every patient fully understands the nature and consequences of the abortion procedure. Not every patient understands the development of the fetus and the stage at which the fetus is and the extent to which it is developed. And that's the point of House Bill 2, to ensure. So let's just be clear. With HB2, comparing it to the initial statute, what is the additional information that a patient gets under HB2 that they didn't get under HB1? Because it seems to me there was literature that talked about the fetal progression that was available during the initial statute. So what's the extra? Well, the extra, Your Honor, is that House Bill 2 really, in my view, is an easier case than either Casey or the prior statute. Because what House Bill 2 is, is it is really truly in the heartland of what states do when they regulate informed consent. I'm asking you factually. Sure. What is the additional information that the patient gets under HB2? Sure, and I apologize for my long-winded answer, Your Honor. I'll answer that directly now. The additional information is they are required to be shown the ultrasound. And they are required to have the ultrasound explained to them and described to them. And House Bill 2 says, and this is important, Your Honor, because the undisputed evidence in the record is that the Applees perform an ultrasound prior to every single abortion anyway. Every single abortion has an ultrasound performed. Another additional thing is the heartbeat requirement. Correct, Your Honor. The heartbeat is also oscillated. It's made audible. And that's additional as well. But doesn't the statute say that with respect to the heartbeat, that the patient can request that the sound be turned down or off? And doesn't it say that with respect to the other thing, that the patient can avert their eyes, put their hands over their ears? And if that happens, are they getting that information? Well, that's correct, Your Honor. They can. And that's, Your Honor, that's in order to respect the individual autonomy of each individual patient. Because, again, the legislature doesn't know what each patient knows or doesn't know. Different individuals have different demands and different needs for information. And House Bill 2 is the only way the legislature could figure out to guarantee that that information would be presented to people. And, Your Honor, nothing prevents doctors from saying what else they want to say. And doctors can put the information in whatever words they want. But, Your Honor, the key point here is that the United States Supreme Court's decision in NIFLA, National Institute of Family and Life Advocates, which was issued just last month, refutes the district court's analysis and the district court's reliance on the Fourth Circuit. That's my main question for you is what is our standard here, our legal standard we're applying? Are we applying NIFLA? And if so, how does this Fourth Circuit test play into NIFLA? I don't see any reference to a sliding scale test in NIFLA. You're exactly right, Judge. Judge Bush, you're exactly right. NIFLA completely refutes the notion that there is any kind of a sliding scale. If Your Honors remember in Stewart, the Fourth Circuit said, well, we've got this sliding scale where on one end of the scale you're regulating the public speech of professionals. And that's strict scrutiny. On the other end, all you're doing is purely regulating professional conduct. And somewhere in the middle you're doing things that affect professional speech and conduct. And that's maybe intermediate scrutiny. What NIFLA says is in general, if a state enacts, states generally cannot enact content-based regulations. But there are two exceptions. Two exceptions. One is the Zouderer exception. Are you arguing that applies here? Well, not specifically, Judge. I think it can apply here because, after all, we're dealing with disclosures that the state requires physicians to make prior to entering into a commercial transaction. They charge for these services, and before they perform this service, they have to make these disclosures. So I think we could rely on it, and I think the court would be within its rights to rely on Zouderer. But I don't think that's our easiest path to victory. Our easiest path to victory is Casey. And Casey, NIFLA says that when you regulate, when the state regulates professional conduct, and that conduct regulation incidentally burdens speech, it's okay. It has to be reasonable regulation of professional conduct. That's correct, Judge. And we get that. Why is this reasonable? Well, it's reasonable for a number of reasons, Judge. First, we know that they're already performing ultrasounds in every case. Every single case, we know they're already performing them. All the House Bill 2 requires them to do is turn the monitor around, show it to the patient, and say, here is what this depicts. And from the record, the indisputed evidence of the record is that this adds absolutely no more than five minutes to the procedure. There's nothing unreasonable about this. But doesn't that take that decision from the patient and put it in the hands of the state by requiring the doctors to do that? You said earlier that a patient got already asked to see the monitor. Well, again, Your Honor, there's – The state is mandating that it be shown. Again, Your Honor, there's a potential disconnect between what the patient might actually know and what the patient doesn't realize the patient doesn't know. And that's what the state is speaking to. And that's what the Supreme Court was speaking to in Gonzales when the Supreme Court said, and I'm going to quote, it said, it is self-evident that a mother who comes to regret her choice to abort must struggle with grief more anguished and sorrow more profound when she learns only after the event what she once did not know. And that's what House Bill 2 is aimed at dealing with. House Bill 2 is aimed to make sure that patients have this information, that they see the information, and they're fully aware of what's going on. And that is what House Bill 2 – it's not ideological. This is purely factual speech. It's truthful. It's not misleading. And it's relevant to the procedure. And we know from NIFLA that that's the test. It refers to Casey. I just want you to fully answer Judge Bush's question because I interrupted you. Sure. I'm sorry, Judge. I actually have two questions if you don't mind if I could add to it. So why is it a reasonable regulation? And then I think the second part of the test is asked to incidentally affect the speech. So why is this only an incidental effect on speech? Okay. Why is it reasonable? Well, I think to answer both of these questions we have to refer to Casey because NIFLA cited Casey as the prototypical example of a regulation on conduct that incidentally burdens speech. So we go and we look at Casey. And what does Casey say? Casey sets up this dichotomy between, on the one hand, ideological speech, which is the Wooley example, the live, free, or die license plate. And on the other hand, you've got the Whelan example, which is just a regulation on the practice of medicine. That case involved mandatory disclosures to the state of prescribing information. And what did Casey say? Casey said that the particular statute in Casey, the informed consent statute there, was under the Whelan example. And why did it find that it was under the Whelan example? Well, the Supreme Court characterized that particular informed consent statute as requiring nothing more than truthful, non-misleading, and relevant information. That's the standard. So as long as we're dealing with truthful, non-misleading, and relevant disclosures, we're under the Whelan example, and Casey says that's rational basis review. That's what we have here, Judge. And Casey characterizes that as a reasonable regulation on the practice of medicine. So if it's truthful, non-misleading, and relevant, it's a reasonable regulation on conduct. And I think the relevancy issue is what really gets to the heart of Your Honor's question. Because there could be instances where, you know, if, for instance, let's say that the state required a physician to read an entire medical textbook to a woman prior to performing an abortion. Your Honor, that's probably not going to be relevant. I don't think that every single thing in that textbook is going to be relevant to the decision. So that probably is not a reasonable regulation on conduct in that instance. But where you've got a situation where you're requiring physicians to provide particularized information that particularly relates to a particular patient, a particular fetus, and her particular situation, and takes absolutely no more than five minutes to do, I think that's right in the heartland of Casey, right in the heartland of what states are permitted to do under their traditional authority under the general police power to regulate the practice of medicine. And that's what we have here, Your Honor. Judge Norris, did you have a question? Well, whether it takes five minutes or three minutes or ten minutes, what you're talking about is imposing the state's will on the patient and interfering with the doctor-patient relationship. Now that's a statement and not a question, but what I do want to know from you is, what's the undisputed evidence in the record that the prior existing informed consent statute was insufficient to inform the patient of their choice? Well, Your Honor, I think the answer is that, as I understand Your Honor's question. Yeah, the question is, what's the evidence that the existing statute wasn't sufficient to achieve the state's objective? The answer, Your Honor, I think quite simply is that the General Assembly had become aware that, in their perception, that this was a problem. I know anecdotally, members of the General Assembly expressed that they were aware of situations like these. We don't have any legislative history on this stack, so for the record. We don't, Your Honor, but that's typical of Kentucky. Kentucky doesn't really have legislative history. Go ahead. So the affidavits don't mean anything? You put them in, didn't you? No, the affidavits, absolutely, Your Honor. Those affidavits are very important. They absolutely do mean something, and that's evidence in the record that shows we need this. That evidence is very important. It shows that there are – But you said you don't know whether those affidavits are post-2000. Well, that's correct, Your Honor, but I don't think it would have made a difference because – Well, why wouldn't it have made a difference if you didn't have an informed consent law prior to 2000 and you got one in 2000? So if these happened before – Well, Your Honor, I think the answer is the information that the women who submitted affidavits said that they would have liked to have had, which is the information that House Bill 2 requires them to be provided, that information would not necessarily have been provided to them under the prior informed consent statute. In fact, those affidavits just quote basically what Casey says. It says it seems unexceptional to conclude that some women come to regret their choice to abort the infant life. So isn't it just reiterating what Casey already said, your affidavits? They mirror Casey. In large part, they do, and what you're seeing there is Casey foreshadowed these affidavits I think basically. Thank you. Thank you, Your Honors. Good morning, Your Honors. Counsel, my name is Travis Mayo. I'm arguing on behalf of the Attorney General of Kentucky. You're going to tell us you don't want to be here. That's correct, Your Honor. Not that we don't want to be here, but the law does not make the Attorney General a proper party in this action. Rather, the law under Ex parte Young and of this circuit in such cases as children's health care as a legal duty versus DEDERS holds – No, we shouldn't even look at your brief because you didn't want to write it. I mean, what's this kind of weirdness? I mean, you're the Attorney General of the state of Michigan. You don't defend the laws of the legislature? Of Kentucky. The Attorney General of Kentucky does. I'm sorry. However, the district court found that he was a proper party, which is why we are here asking this court to reverse the decision because in this case the plaintiffs named the Attorney General as the chief law officer of Kentucky with general enforcement authority in the belief that he would enforce the civil penalty here, which is a fine, but which statute expressly delegates the collection of unsatisfied judgments and debts to the Kentucky Department of Revenue and to the local prosecutors and Kentucky commonwealth's attorneys and circuit courts and county attorneys and district courts. So the way the Attorney General was brought into this case as a defendant required him to defend that Eleventh Amendment immunity and that it does not fall within the exception stated in Ex Parte Young because there is no connection, which Young requires, between the Attorney General and House Bill 2 in this case for the collection. I should know this because I'm from Kentucky, but let me ask you. Do the prosecutors in Kentucky not report in any way to the Attorney General? Yes, Judge Bush. There is a unified prosecutorial system that does fall within KRS Chapter 15. However, KRS Chapter 15, specifically KRS 15020, which provides the Attorney General with his general enforcement authority as the chief law officer of the state and on which the district court relied without citing or quoting his complete language, says that he shall defend the commonwealth and litigate cases on behalf of the commonwealth except where it has made the duty of the commonwealth's attorney or county attorney to represent the commonwealth. There are separate statutes in KRS Chapter 69 that make it the duty of the commonwealth's attorneys and circuit courts and the county attorneys and district courts to not only attend to all civil cases and proceedings in which the commonwealth is interested in their respective jurisdictions, but also to take the necessary steps to collect unsatisfied judgments and cause them to be paid into the state treasury. So while there is a unified prosecutorial system in KRS Chapter 15, and the Attorney General does have a role in that with that prosecutorial system, that chapter also, along with Chapter 69, gives exclusive jurisdiction to those local prosecutors. So is it the Attorney General's contention that unless the statute specifically says the Attorney General is charged with defending the constitutionality of the statute, that the Attorney General doesn't have a power to defend the statute? It's the Attorney General's contention that under Ex Parte Young in cases such as Jeter's and Russell and this circuit, that there must be, when he is named, an Attorney General or other state official is named as a defendant in its official capacity because his general enforcement authority, without any connection between that state official, in this case the Attorney General, and the law at issue, is not sufficient to abrogate that Eleventh Amendment immunity and fall under the exception stated in Ex Parte Young. And that was the role the Attorney General was in here, Judge Bush. Rather than being noticed of the challenge to the constitutionality of House Bill 2, he was named a defendant because of his general enforcement authority under KRS 15020. And along with those local prosecutors, the appellees point to KRS 15060 and say that the Attorney General may step in the shoes and collect unsatisfied judgments for the Department of Revenue. However, that statute expressly states that he may do so only when upon the request of the Department of Revenue. And it also concludes... The red light is on, so finish your sentence. Unless you're going to be using some of the rebuttal time, you'll need to stop. No, Judge, I appreciate it. Thank you. I'll finish my sentence. That statute also says, except where specific statutory authority is given to the Department of Revenue to do so. And that specific statutory authority to collect unsatisfied judgments and fines is given to the Department of Revenue under KRS Chapter 131. So we would ask that this court reverse the district court decision and find the Attorney General was not a proper party to this action. Thank you. Good morning, Your Honors. Alexa Colby-Melinas for the Plaintiffs' Appellees. HB 2 requires physicians to force ultrasound images, a graphic description of those images, along with fetal heart tones, on patients while they are lying on an exam table half naked with an ultrasound probe either inside... This is not an undue burden case. This is not, Your Honor. This is a First Amendment claim. And this is about the speech that HB 2 forces physicians to impose on their patients even while the physician must keep speaking, even if the patient asks them to stop, even if the patient is plugging her ears or hiding her head in her shirt or sobbing hysterically, all of which is what happened before this... Do you have any authority that the effect on the speaker has any relevance to a First Amendment claim? Yes, Your Honor. It's relevant... The effect on the listener has any impact? Yes, Your Honor. I think it's relevant here. There are sort of two lines of First Amendment cases that will make that relevant. As Stewart, the Fourth Circuit, Judge Wilkinson and Stewart pointed out, that when we are looking at and evaluating compelled speech in particular, the effect on the listener is relevant, particularly when we are talking about a captive listener. So Hill v. Colorado is a U.S. Supreme Court case in which the effect on the listener is relevant. What was that case about? That case was about protests in front of people's homes. And so it was about a captive audience and the effect of protected speech on the audience. And so the other reason it's relevant here, of course, is because of what NIFLA has most recently instructed this court to do. And NIFLA makes very clear that speech between physicians and patients, including compelled speech, even if it's factual, even if it's designed to inform the patient, is protected, fully protected by the First Amendment, unless it falls within a traditional and historical exception for informed consent. And the reason that the effect on the listener is relevant there is because, as the undisputed evidence shows, as well as the evidence from the American Medical Association and the American Congress of Obstetricians and Gynecologists, informed consent is not designed to reduce patients to sobbing, to plugging their ears while their physicians are still talking to them, to hiding their head in their shirts, to having to beg their physician to stop. Informed consent at its heart is about patient autonomy and self-determination, and it's about the trust and the relationship between a physician and a patient. And so by utterly destroying any elements of that, it is so clear that this law does not fall within a historical exception for informed consent and therefore should receive the full protection of the First Amendment. And that is why the effect on the listener or the effect on the audience here is relevant to the court's analysis. Let me ask you, is performing an ultrasound, is that standard of care for, Absolutely, not only performing the ultrasound, but offering to show the woman the ultrasound if she wants to see it and to ask any questions. The plaintiffs all testified in the undisputed evidence here is that, that is, But you don't have to offer, you don't have to tell the patient that she may see it if she'd like to see it under the NAF standard. Yes, you do. It's just if she asks you. No, Your Honor, it's you must offer. It's not just if she asks, you shouldn't refuse. The standard is you offer. So that sounds to me like it's pretty close to subsections A and B of House Bill 2. You're already doing that. We are already offering any information, even beyond what would be contained in HB2, to the patient. What isn't the standard of care and what the plaintiffs weren't doing is forcing it if she said she wasn't interested or continuing to force it if she asked them to stop. So when you say standard of care, are you saying you commit malpractice if you don't do the ultrasound as part of an abortion procedure? It is the, well, I think there's two elements there. I think it has become quite common, if not universal, to perform an ultrasound for clinical and diagnostic purposes before an abortion in order to date the pregnancy, to ensure there is a pregnancy, to ensure that you're not dealing with an ectopic pregnancy, to see if there's any anatomical problems. I think it would be, I can't say that I know for sure if there are any doctors out there who would say that they could do that without an ultrasound, but it is certainly far and away the pervasive standard of care to do that. It is also, according to the clinical guidelines by the organizations that accredit abortion clinics, the standard of care to offer, to show the ultrasound images to every patient and to describe them if she wants them, to answer any questions. So certainly someone... Let me take this out of this context. Suppose you had an x-ray of someone who was a smoker and the x-ray showed that you had to do some surgery on this person or bad things are going to happen relating to the lungs. So there's an x-ray of the lungs. Would you say the government could require the doctor in that instance to show the x-ray to the patient or does the doctor have a First Amendment right to only offer it to the patient and allow the patient to say, I really don't want to see that x-ray? I think it depends, and I think you would need certainly some evidence from oncologists or someone who practices in this area, but I think it depends on what information needs to be conveyed to the patient. So I think it is undisputed here in all areas of medicine that there are core components to informed consent. And that's understanding the risks and benefits of the procedure, understanding the nature of the procedure, understanding alternatives. A patient must have that information, otherwise he or she just simply cannot provide informed consent. And nobody is saying that the First Amendment would stop a state from requiring physicians to give that information to patients. But we also have evidence here, including from expert ethicists, that is undisputed, that in no area of medicine is showing pictures to a patient the only or required way to certainly convey information, even if it is necessary information. So I think it would perhaps if the state passed a law that said, no matter what the patient said, no matter what the patient already knows, no matter what the situation, you must put that image in front of their face. And even if they close their eyes, don't take it away, you keep it there, I think there might be a First Amendment problem because I think we're outside the realm of informed consent. But something that simply requires information. I wanted you to talk about, you've averted to the Fourth Amendment case, Stuart. And I want you to tell us why the analysis in the Fifth Circuit's and the Eighth Circuit's case is not the analysis or the result we should apply here. Could you distinguish those? Yes, Your Honor. And I think that the most recent decision from the Supreme Court in NIFLA also illustrates why the Fifth and the Eighth Circuit are wrong. The Fifth and the Eighth Circuit essentially applied the undue burden standard, which we have all agreed is not relevant here, which is to say any information that is truthful and non-misleading, the state can require physicians to force on patients. What NIFLA says when we were dealing with information that the state of California was purely factual, non-misleading, designed to inform the patient, based on the state's belief that the patient didn't have access to this information, the Supreme Court said that's not good enough. We don't take all physician speech out of the protection from the First Amendment just because you state want patients to have this information. We are only going to say that physician speech lacks protection if it falls within a traditional sort of historic exception for informed consent. And that is what's relevant here because what we are talking about, this law has nothing to do with informed consent, and that is why the Fifth and the Eighth Circuit's conclusion that physician speech just automatically has no protection any time truthful information is involved is incorrect. The Fourth Circuit, of course coming before NIFLA, did discuss a sliding scale, which NIFLA has now said is certainly not the case. But contrary to what... Is it your position that strict scrutiny should apply then as opposed to intermediate scrutiny? I certainly think that under NIFLA strict scrutiny would be appropriate, but as in NIFLA, I think in NIFLA at the end of the day the Supreme Court held that because that law didn't survive even intermediate scrutiny, it was going to strike it. It didn't actually do a strict scrutiny analysis. And I think the same thing is the case here. The district court below held that this law didn't survive even intermediate scrutiny, so it would be perfectly appropriate for this court to affirm that decision, but it would also, I think, be appropriate to apply strict scrutiny. Can I go back to the statute? I mean I have no idea what you're claiming. It doesn't seem to line up with what your brief said. Can we go through the statute? Yes. Let's go to subsection B. Yes. Tell me what's wrong. Under 2B, provide a simultaneous explanation. Right. Well, I think exactly right there. What happens now and what is the standard of care is that the physician performs the ultrasound, and in order to do that, the physician has to have the screen in front of her so that she can see what's on the screen and do her clinical and diagnostic things. That's C, I guess. Let's do B first. Well, right. So what she does not do now is provide, without the patient's consent, a simultaneous explanation of what the ultrasound is depicting. She asks the patient if the patient wants the specific, any information that's contained in the ultrasound, but she does not provide a simultaneous explanation. But that's only part of the speech that this compels. Okay. So what's wrong with number 2? You say you perform the ultrasound already, and this says you have to display it so she could, may view it. What's wrong with that? What's unreasonable about that? That she should have the option. If she doesn't want to view it, why should she? It says she doesn't. It says she has to avert her eyes, she has to cover her eyes, or she has to put her head in her shirt. That's not how informed consent works. That's how an angry parent talks to a child they're upset with. So it's the same thing with D, this loud beating heart is horribly offensive. Is that it? If she doesn't want to hear it. If she does want to hear it, there's nothing. She doesn't have to hear it, may hear. I think any situation, it doesn't resemble anything like informed consent to have a situation where a physician is saying, you don't like it, plug your ears. You know what this sounds like to me? Informed consent to you is under NAF or whatever your organization is. Your doc can perform the ultrasound. He looks at it. She's not looking at it, he's looking at it, and he says, oh, boy, it's a go. That's okay, right? The state can't require anything of him except what's good to me. No, I don't think that's true at all. I think the state could, of course, they didn't do this here, but they could require the physician to say, would you like to see your ultrasound? Are there any questions you have about your ultrasound? I think absolutely there's nothing wrong with the state requiring physicians to offer that, but to say, I'm going to shove this in your face right now, and if you have a problem with it, feel free to hide your head in your shirt. I don't think that resembles informed consent. Now, the state has a right to try to convey, let's be very clear, to convey this information to patients, but what we're talking about is conscripting the physician to do it. Is there anything untruthful about giving her the opportunity to look at it? What's untruthful about that? There is nothing, and that's certainly not our argument. Okay, but I just want to be clear. Is the language of the statute giving her the opportunity of forcing her to make, forcing it on her and requiring her to take evasive measures to avoid seeing or hearing that which she does not want to see or hear? Yes, the statute says nothing shall be construed to prevent a woman from averting her eyes. Okay, but you told me that under the existing – well, no, you didn't tell me this. The other side told me, under the existing statute, in a situation where there's the ultrasound and all, if a patient wanted to have the doctor do a simultaneous viewing of that, that's not prohibited. No. If the patient wanted to hear the oscillation of the heartbeat, there's nothing to prevent her from doing that. Absolutely not. Okay, but this takes the decision away from the doctor and the patient, and the state mandates a procedure. Yes, and mandates, specifically in First Amendment context, the delivery forcing speech on the patient. But there's no abridgment of the right of the doctor to say whatever he or she wants. I mean, as long as they provide what the statute says they're supposed to say, they can say, I recommend you have an abortion. Well, I think that may be unethical for other reasons, for a doctor to try to pressure a patient into a medical decision or not. But under the statute, when we're talking about the forced ultrasound, certainly they can add additional words beyond what is required in the statute. And, for example, the plaintiffs here did say, right now I'm going to show you this screen and describe it because the state has changed the law and is requiring me to do that. But I guess my point is there's no restriction on whatever medical ethics allow you to say as an opinion, as a doctor, there's no restriction on the doctor's offering of his or her opinion. No, absolutely not. This is just of the problem with this statute is merely that it's forcing certain information, but not that it's stopping additional information. And the Supreme Court has recognized, for example, in cases like Hurley, that just the fact that an individual may add additional speech or even add a disclaimer isn't sufficient to save something from First Amendment validation. Quick question. In this HB 2, is there an exception to this procedure in the case of rape or incest, whether it's a pregnancy resulting from rape or incest? There is no exception for rape or incest or for fetal anomalies. And, in fact, the Texas statute actually did have an exception for both of those things. But this statute, like the statute that was addressed by the Fourth Circuit, has no exceptions. Thank you. Your light is on. Thank you. Your Honors, I'd like to focus the Court's attention on one overarching question that kind of hovers in the background of this case. And that question is this. Are states going to be able to continue regulating the practice of medicine pursuant to their traditional authority or their traditional police powers, or are the federal courts going to now oversee the informed consent process? That's an issue that really hovers in the background here. And the answer is set forth in NIFLA. And NIFLA quite clearly says that this is the province of state legislatures. And where state legislatures are regulating professional conduct and only having an incidental burden on speech, it is not a First Amendment problem. And NIFLA points us to Casey to determine when that is. And, Judge Bush, you asked about the reasonableness issue earlier, and there's another thing I'd point out in that regard. These disclosures are just pure scientific facts. What appears on an ultrasound and the scientific description of that is a pure scientific fact. There can be no debate about its accuracy. There can be no debate about its non-misleading nature. There can be no debate about its relevancy. And that is all that the Commonwealth of Kentucky is requiring here. And the Commonwealth is requiring that because it is the only way to guarantee that the patient actually receives this vital information. The affidavits that we've got in the records show that there are a number of patients who don't fully understand the nature of the fetus within them or the nature of the procedure. So if they're simply offered the information, they might reject the information, thinking, well, I don't need to know that because I already know what I need to know. And if that's a mistaken assumption, then later on when they learn the truth, Casey and Gonzales... But how is that different if, when showing the images, the patient has subverted her eyes or has covered her ears? Aren't you still in the same position? Well, no, Your Honor. The patient is not going to know because the patient chose not to view and not to hear. Well, Your Honor, at that point at least the patient has the opportunity to correct any mistaken understandings the patient might have. And that's the whole point here. This respects the patient's autonomy by giving the patient the freedom to reject that information. Your Honor, this is truthful, non-misleading, and relevant information. And that is right in the heartland of the state legislature's authority to regulate the informed consent process. NIFLA tells us that. This is absolutely not ideological speech. Does that state take into account the trauma that might be inflicted on women who are forced to see and hear those images that might affect the decision that they make one way or the other? Well, Your Honor, I can tell you that that's an issue that the legislature would have weighed. And I think the Kentucky General Assembly takes its obligations from a policy standpoint very seriously. And I'll point out that the majority of women in the legislature voted for this bill. And, Your Honor, we know from case law, from Casey and Gonzalez, that on the other side of this issue there is a very real trauma that can occur when women have an abortion without having all of this information. And we see that in the affidavits. So there's a potential. We know there's a potential for trauma when they don't receive this information. Casey and Gonzalez tell us that, and our affidavits tell us that. And, Your Honor, that is what the legislature was trying to avoid. And, Your Honor, I assume my light is up. May I take one quick sentence to wrap up? Only one sentence. Yes. Your Honor, we respectfully request that the court maintain the Commonwealth's authority to regulate informed consent and reverse the district court. Thank you, Your Honor. Thank you. Thank you for your arguments. Thank you for your written submissions. The matter is submitted, and we will rule on it.